Thank you. Good morning. May it please the Court, I am Theodore Amaya, here representing Appellants Aviva and Kirsten. I'd love to reserve five minutes for rebuttal and funding. Your Honors, the final approval order and judgment in this case should be reversed because the District Court failed to apply heightened scrutiny to this pre-certification class settlement that was reached prior to any decision on a contested motion for appointment of lead counsel under Rule 23-G. The settlement was negotiated in secret from Appellants Counsel and or all three sides of collusion that this Court outlined in Wright-Bluetooth. What exactly is the deficiency here? Because he certainly held a hearing and considered this, you know, and articulated in the course of the hearing and the back and forth with counsel. He clearly was considering a lot of the issues that we've identified that he should consider. So where is the deficiency here? Because there is a discussion. We know we considered them. Your Honor, the judge never explained in the final approval order and judgment or in any of the transcripts why we shouldn't be concerned by these signs of collusion. So it's an articulation issue. It's not that he wasn't aware of the issues. It's not that he didn't develop a record on the issues. It's an articulation issue, the fact that the order doesn't explain what he did with everything that had been developed. Is that the objection? Well, Your Honor, I think there is an articulation issue in that there was no explanation of the heightened scrutiny applied or how that worked out. But I think more fundamentally, there's a real fairness problem with this settlement. And perhaps that's why the analysis isn't there. Most fundamentally, Your Honor, the settlement does award a disproportionate amount of fees to class counsel when compared to the relief obtained by the class. It's an inherently reversionary claims-made settlement. So we have to look at the claims numbers that were reported in final approval in order to understand what the class is getting and compare that to the $800,000 in fees that class counsel received. And if we do that, which the court didn't really do in a meaningful way, we can see that it's a disproportionate award. So I think that's a real substantive problem that goes to the fairness of the settlement beyond any just matter of articulating what scrutiny was applied and the outcome of that. Can we address that by directing the district court to look at the fees again and perhaps reduce it? I know that's probably a result that neither side wants, but is that an option we have? It's not undoing the settlement altogether. I think that the judgment should be reversed. And I do think that directions should be given to the district court to make any award of fees commensurate with the relief actually obtained by class numbers. Did you answer the question that was specifically asked, which is, do we have the authority to focus only on the fee piece and not do what you would like us to do, set aside the settlement approval as well? Your Honors, I think you do have that authority, but I am also suggesting that there are fundamental fairness issues here. Sure, sure, sure. I appreciate that. If I may continue, I just want to follow because I want to understand why a reduction in the fees would not cure what you contend are the particular substantive deficiency that comes from the mismatch. Why, if the fees are reduced and then that feature of the settlement is eliminated where there's a mismatch between the fees and the award obtained for the class, why isn't then at that point the settlement okay under the relevant standard? Well, Your Honor, I simply think that analysis hasn't been done. I want to understand substantively why that is wrong. Okay. Your Honor, I think that could be accomplished if the lower court could satisfy itself and explain that a settlement, total settlement value of, say, $1.7 million, which is where I put it right now, including the $800,000 award of attorney's fees, is fair, reasonable, and adequate under the facts of this case. Does that make sense, Your Honor? Well, I'm still hearing that back as a procedural objection. I want to understand what is the substantive set-aside, the procedural issue. I understand that, but I want to understand your argument separately. What is the substantive objection to that you say would require vacature of the settlement if the fees are reduced? Okay, Your Honor. Rule 23 requires that a class settlement be fair, reasonable, and adequate to merit approval. And I think putting aside whether or not we're talking about fees specifically, we have to look at the amount that is obtained for the class in relation to the value of those claims, right? And I don't think that analysis was done. And to the extent it was done, it was premised on inflated numbers that bear no resemblance to reality. Maybe what we need is more focus. Frankly, I understand that was your argument, but I really didn't understand in substance, and this might apply to both sides, what there is in the record that gives us the basis to reach the determination that you're seeking, which is that the amount was inadequate. I mean, I understand your argument that you've got this potential penalty under California law, but I have to say, as I went through it, it seemed to me like that's reaching for the golden ring, but not a ring you're likely to capture. There were some real reasons why the court had reason to think that wasn't in the offing. And so what is it that was so inadequate about the settlement as against the real value of the claims, which it's been quite a while since I was in practice, but I had practiced in the field. Let me put it, how quickly were the lawsuits filed after the publicity about the data breach? Your Honor, they were all filed in a matter of a couple weeks, from mid-November to December. Because the cases get filed, and then people look to see if there's value here. And I look at this, and I really haven't seen the value here that would justify or that is necessary for your argument that this settlement is inadequate. So where is that value? Part of the problem, Your Honor, is that this settlement was reached prior to any discovery being conducted. So it's very hard to get into the merits of the case, and I don't think we're here to get into the merits of the case, right? How do we not, to the extent that if we have to determine what the appropriate fair value of the claim is, that inevitably is going to require some consideration of not adjudicating the merits, but trying to get a sense from the perspective of early in the case where you've got a wasting insurance policy and have reason to want to try to reach an early conclusion, we have to make an assessment based on something the district court at least gives the outline of having made an assessment, although not with perhaps as detailed an explanation as might have been like. But what do we have to suggest that's wrong? Sure, Your Honor. Well, I think when we're talking about a claims-made settlement where there is no common fund, that no non-reversionary common fund at the defendant is paying out, any fairness analysis has to turn on the value of the actual claim submitted, and it has to look at those numbers, not just pre-validation, but what are class members actually getting. Here, the numbers that were submitted to the court were grossly inflated. We pointed out in our papers how the claims for out-of-pocket reimbursement, which were capped at $1,000, were claimed for 176 of those claims. They claimed a value of $384,000 more than that, which obviously doesn't work if they're capped at $1,000. But beyond that, what we didn't point out in our papers and I'd like to point out now is the claims for extraordinary losses, which were capped at $5,000. Well, the interesting thing there is that if you look at the claim form, and this makes sense, in order to be validated, any of those claims must be more likely than not have been caused by this data breach, which, according to the defendant, they say they paid the ransom, there's no risk. The mediator, in this case, during his testimony, said these sorts of claims are highly unusual and they're not going to be validated until after the effective date when class counsel already has their fees. And they claimed another almost $200,000 there. I think that's highly likely to be zero once those claims are validated. It seems like really the crux of your complaint, substantively, is that it's a claims-made settlement because just on an abstract level, it seems like it does provide class members with benefit. They get credit monitoring up to $1,000 in most cases. So if everyone submitted a claim, it could be a valuable settlement. I guess your complaint is that it's claims-made, and claims-made typically, the redemption rate is very, very low. So the defendant settles on the cheap. But we've never established a per se rule against a claims-made settlement. No, Your Honor, and I don't think I'm even suggesting that, but I do think they need to be examined with the heightened scrutiny this court has outlined. And I think when we're talking about a claims-made settlement, that requires looking at validated claims numbers if you're going to do this structure. Just as in a coupon settlement, you can only get fees after the coupons are redeemed, right? Isn't this similar? We don't know what the class is getting until those claims are validated. So how can counsel be awarded fees on some hypothetical claims number, you know, or even obviously inflated claims numbers? Let me go back to the fees. Let me go back to the fairness. You argued with some justification that perhaps the value assigned to the settlement is subject to some deflation. But I still haven't heard a very powerful argument that the class has much of a claim. And so when it comes to evaluating the fairness of the settlement to the class members, it's not like I'm hearing a whole lot of money is left on the table, aside from the attorney fee part where the clear sailing agreement guarantees some certain amount to the plaintiff's attorney. But from the class perspective, the settlement approval perspective, I'm still not hearing what I think I'm waiting to hear, which is why is it we think there's more value there than was realized in the settlement? Well, Your Honor, I know Your Honor already sort of didn't seem super impressed with our claim under the CCPA, but I would respectfully disagree. We did survive a motion to dismiss on that claim. It offers statutory damages at a low end of $100 per claim for each California class member. And the statute says if a business that collects personal information fails to employ reasonable security measures, then the victims of that data breach are entitled to those statutory damages. I see that as a strong claim. We might disagree. We might disagree about that, but it hasn't been tested, and it hasn't even been tested by discovery. Have there been class settlements based on the CCPA where the underlying facts were data breach? Your Honor, I'm sorry. I don't have an answer on that. I wish I did, and I'd be happy to submit additional briefing if Your Honor wanted that. But I think it is a relatively new provision that we're talking about. And certainly there are class settlements. There's good precedent under, let's say, the CMIA, which similarly provides for statutory damages where a data breach compromises health-related information. And there are many class settlements in that context that give California class members preferential treatment and significant recovery, right, in recognition of the value of those claims. And I would contend that the same approach should be taken here and is merited at least at this point. We may be still, data breach is not brand new, but it's not something we've really gotten our, at least in my case, arms around yet. And I would like to focus on one question there, which is, is there anything that establishes or gives serious support to the proposition that any actual losses have been suffered by class members? Are we simply looking off to the future and trying to project still? Well, Your Honor, I think we don't have discovery, okay? So it's really hard to get into the merits of the case here without any discovery. We do have allegations by certain named plaintiffs that they have suffered fraud increases and, you know, those need to be, you know, could be sussed out. But I think fundamentally, the defendants say, well, we paid this ransom and all is well. We don't know that the hackers who perpetrated this attack aren't going to release this information or use it for fraud themselves at some point in the future. They say, well, you know, this hacker group is going to lose its credibility if it does that. Well, we don't know if this hacker group is going to, you know, maintain its composure that way. You know, I don't know who they are. I don't think anybody knows who they are. And will somebody take advantage of this valuable private information that the hackers obtained? That seems like a real risk to me. And I think that that means class members need to remain vigilant going forward, and they're going to need to do that for years. Did you want to say something? I would like to reserve time. All right. Thank you. Thank you. All right. And then we'll hear first from Mr. Leach or Leitz. Mr. Leitz, your honor. Leitz. Okay. You may proceed. Good morning, Your Honors. May it please the Court. I'm David Leitz for the Plaintiff Appellees. And with me is my co-counsel, Rochelle Bird. The Court reviews approval of a class action settlement for clear abuse of discretion. And frankly, Your Honors, there's no abuse of discretion here. The appellants have completely failed to show that. Where the District Court, in a sound exercise of its considerable discretion, approved a settlement that's very reasonable and adequate. Well, I want to focus on one aspect of it, which is this procedural issue of the articulation. Because there's some suggestion in our case law, I'm looking at the Roe case in particular, where we've suggested that the order has to grapple with the issues. And what we said in the Roe case, in footnote 13, is the Court's conclusory statement, without any further analysis, that the settlement, that, quote, the settlement is a product of serious non-collusive arms-length negotiations and was reached after mediation with an experienced mediator at the Ninth Circuit, close quote, is insufficient. This is the, it's a complete rubber stamp. He just took out the general formula, slapped it in the order, and we have no idea what he did with all that stuff that he developed over two days. He just didn't tell us. He made a great record, and the ruling is a cipher. What do we do with that? That is the question, Your Honor. There's no question that the order from Judge Carter is brief, and it doesn't articulate with specificity what exactly he relied upon. But I think that in the Roe case law, the Rhapsody case law, and also Bluetooth, what's required here is to look at the record holistically. So the Court just recognized that he developed a heck of a record here over the course of about ten months, starting in April 22, 2022, when he took the extraordinary step of ordering the mediator, in this case, to appear live and in person for sworn testimony. So this is where Judge Carter starts his heightened scrutiny, and he develops an extensive record through the court hearings and talks about why it is that he rejects the allegations of collusion. He doesn't. He actually, on the record, because I went through the transcript to see, maybe he orally sort of laid it out. All he does, he does identify the issues. He identifies the questions. Oh, I'm really worried about that issue. I'm really worried about that. And then the order, nothing. I don't know what he did with it. Well, Your Honor, at the preliminary approval hearing, he did take the sworn testimony of Mr. Friedman, the mediator in this case, and obviously he credited that testimony as being credible, that there was no evidence of collusion here. There's also representations from counsel in the pleadings that were submitted and obviously considered by the judge. You can tell by Judge Carter, the nature of Judge Carter's questioning, that he deeply considered the pleadings that were submitted by both parties, by both the plaintiffs and by the plaintiff at balance in this case. He couldn't have asked the questions that he did if he hadn't given heightened scrutiny to these arguments that were being made. And also, Your Honor, there's a question here about the appellants and what they didn't do at any of these hearings. So what they didn't do at the preliminary approval hearing is ask to cross-examine Mr. Friedman. They didn't ask to call any of us to testify about what happened in this mediation. They didn't help to create the record that they basically are saying supports these allegations of collusion. All they did was point to things like the clear sailing provision and what they call the kicker clause, and then they just sort of assumed from that collusion, collusion, collusion, but there's no evidence, Your Honor. And to the contrary, the evidence, which is clearly considered by Judge Carter, is that there was no collusion here, not only in terms of what happened, but also in the sequencing of it. It's very important, Your Honor, when you're bandying around these very serious allegations of collusion, to note the fact that there were actually two mediation sessions here, and the first mediation session did not result in agreement on the terms of class relief. So you had a whole day of mediation where me and my colleagues were negotiating hard for fair, adequate relief for this class in a doubtful and disputed case, and we didn't get there. We didn't get there after a full day of mediation. If this was some sort of collusively cooked up settlement where we got together with the defendant and said, okay, well, we'll give you sweetheart terms on class relief if you give us a big fee, there would be no point to do it over two days on just class relief. It generates more hours. I mean, it's easy to come up with an explanation. One of the problems in antitrust law is a perfect collusion and perfect competition may look the same, and I can see that here. So let me focus on, well, let's start with the clear saving provision because I think that may be the brightest potential red light in terms of why would a defendant say that unless that's the key to actually getting this thing resolved. So what's the purpose of that? How could that support the fairness of this settlement? Your Honor, I probably take a contrary view about clear sailing provisions in settlements like this, and really it's sort of one that's born out of doing a bunch of settlements, probably over 100 data breach settlements in the last four years, and effectively there's a clear sailing provision in every one of these settlements, whether it's explicitly stated or not. You know, if you have a common fund settlement, for example, and the litigants come before the court and they ask for a percentage of the fund and the defendant doesn't contest it, how is that any less of a clear sailing provision than if you explicitly state in the settlement agreement, we're not going to contest that. The key to it is whether or not the defendant actually puts into the settlement agreement, we reserve the right to contest the fee award. But otherwise, you could go through a legion of data breach settlements and settlements in really any different area of law, and unless you see some sort of contest by the defendants to the attorney's fee request, wasn't that sort of baked into the cake that you're basically going to have, you know, the ability of the plaintiff's lawyers to apply to the court who has the fiduciary duty to sort of look on behalf of the class at where the money's coming from. Common fund settlement, defendant doesn't have an incentive. They paid out $5 million. After that, the court divides it up. In this context, okay, they pay out whatever it's going to cost to accomplish this settlement. And by the way, yeah, we'll say okay to paying counsel this amount, which could produce a pretty hefty percentage of what otherwise might have been put together as a common fund, and that's really the problem in this case because the amount being paid to the attorneys appears to be substantially above the 25% benchmark level. Even if you don't try to deflate the value of the purported settlement value, which I have to say I have some doubts about indeed as to some of the value that's purportedly pushed forward. And so it seems to me it's worlds apart from the common fund situation. If CPK is willing to say okay, we're going to say okay to $800,000 to the attorneys, why isn't that money that could have instead somehow been worked into the common fund variant, which in this case would be instead of what is $100 per California person, either $25 or something. So why shouldn't that be viewed as prima facie evidence of collusion? Three reasons, Your Honor. First of all, the court, the district court has their fiduciary responsibility to the class to look out for the best interests of the class and to give the exact kind of heightened scrutiny that Judge Carter gave here to the attorneys to be awarded. So I'll acknowledge that, except that the whole argument is that the record made doesn't demonstrate that he gave the heightened scrutiny. So that's one. Number two. Number two, Your Honor. Basically, as the court in the Deepwater, the Eastern District of Louisiana said in the Deepwater Horizon case, you can look at sort of the attorney's fees that are negotiated in a claims-made settlement as kind of, again, a quasi-fund where if it wasn't an agreement on the attorney's fees and the cost of notice and administration that's paid separately in part by the defense, then that's got to come out of the common fund at the expense of the class. So, again, when you're evaluating the attorney's fees as a percentage, you have to look at, like, well, okay, what's the overall value of this thing? So it kind of becomes a quasi-fund. And the third and most important thing, Your Honor, is that claims-made settlements, which have not been, per se, condemned by this court or any court in the Ninth Circuit and which do get approved by Ninth Circuit courts on a routine basis, it's sort of rolling the dice on the part of the defendants. And I don't want to drift too far into, you know, things that are outside the record here, but my colleague, Ms. Bird, recently did a settlement in California State Court that was claims-made where the claims rate sort of blew the lid off any sort of reasonable expectations and where the attorney's fees ended up being a much smaller percentage of the whole amount that was actually paid to the class. The issue, the concern is that when you have this kind of clear ceiling with an $800,000 cap, the defendants basically said, I'm good for $800,000. If the court gives the full $800,000, I commit to it. And as between that arrangement and an arrangement where $800,000 will go on the table and, you know, the court will determine how much will go to fees and the rest will be an additional common fund on top of the other forms of claims-made relief, that will go to the class members. The defendant is indifferent between those two. The defendant's out $800,000 potentially either way. But you're not indifferent between those two, and that is, I think, the concern. Yes, Your Honor, but we'll take our licks. You know, so if the district court here had decided in an exercise of its discretion after the heightened scrutiny to give us a lesser award, we wouldn't have appealed it. And, in fact, the appellants in this case at numerous points basically pointed at that as the solution here. In the preliminary approval hearing, they said, you know, give them a 25% negative lodestar multiplier. We think that number is about $500,000 in fees. Later on, they said $384,000 in fees would be okay. So it's really only a matter of degrees here. And at the December 5th hearing, the 2022 hearing in front of Judge Carter, he himself mused about sort of, well, maybe $440,000 would be a better number, because if you added that to sort of the class benefit that I've calculated here, and you include the cost of notice administration, you come up with this amount, and you can backwards engineer to a 25% sort of number. But on the fees, Your Honor, it was sort of a two-part analysis. The district court here did basically evaluate the fees first and foremost on the lodestar method and did so in accordance with the case law, which basically says for these claims made submissive. But there's nothing in the record that the court scrutinized that lodestar at all? Well, it took the expense. Rather than saying whatever the $700 is fine, but it never really scrutinized the lodestar here. It scrutinized it only in the sense that it looked at sort of the total number of hours and looked at the hourly rates, found that the hourly rates were commensurate with the hourly rates that are paid in the Los Angeles legal community. Can you address the September 22 hearing? I think you had represented to the court that the unvalidated claims were worth about $1.16 million. And of those, there were 176 ordinary expense claims that were supposedly worth or had submitted for $384,000. Do you agree that that has been corrected to $176,000 because it's capped at $1,000 per person? Yeah, I want to explain how that happened, though. So what we did was commission the settlement administrator here to basically give us the declaration about the claims data. And so that number on the ordinary loss was the amount that was actually claimed by class members. The step that was missing, and it was missing by us, it was also missing by the appellants who never raised this, never alerted Judge Carter to it at any point during this ten-month process. You know, it should have been capped off. So at most, the value of the claims to the class is around $900,000, right? It's between $900,000 and a million, Judge Lee. And, you know, I did a rough calculation of it. If you did sort of back out and cap the ordinary loss, you'd end up with a load star or a percentage of the fund multiplier that's just a shade over 40%. So you'd go up from 36.3%, which the court found was reasonable, given that the percentage of the benefit here was used as a crosscheck only on the load star. And, you know, so it's a matter of degrees. We're going from 36.3% to a shade over 40%. If you take, you know, what is this post hoc argument by appellants that they didn't give to Judge Carter, that, you know, you should cut that number down. But the problem here is, you know, in terms of whether the settlement was fair and reasonable, maybe we could look at the records to say that the district court did this, that. Maybe we could do that. But with the fees, there's nothing in the record explanation. In fact, at one point earlier, the judge says, well, if the claims are worth $800,000 and the attorneys are asking for $800,000, I'm not going to approve it. And it turns out it's pretty much like that, but somehow the court approved it. And we have no idea how or why the court approved the fees. Again, Your Honor, I believe that Judge Carter created an elaborate, holistic record over the course of these various hearings. I do note that, again, just in terms of things that the court probably should be looking at but doesn't have in front of it, the hearing transcript for the December 5th, 2022 hearing somehow didn't make it into the record. And I only realized that in preparation for this argument. But if you looked at that along with the other hearings, the final verbal hearing. To the district court record. You just mean it's not in the excerpts. Correct, Your Honor. So the court could look at that. The court could look at the November 7th, 2022 final verbal hearing. Could look at the June 29th preliminary approval hearing. And, yes, Your Honor, basically the court did say, if you're going to come in with $800,000, I'm not necessarily going to approve that. I'm going to give that heightened scrutiny. I'm really going to put you through your paces. And you proceeded to do it with the supplemental briefing on the attorney's fee question that was commissioned by Judge Carter and that was submitted on November 21st, 2022. The additional hearing that he had that was specific to the December 5th, 2022 hearing, which was all about the attorney's fees. So, again, this court has to decide whether or not you're going to create a bright line rule that the district courts have to really put pen to paper and really write this all out. Or whether or not we can sort of adopt to a model where there's a holistic record here created over the course of many pleadings and many hearings that the court, this court, can rely upon to evaluate whether or not the district court did apply the heightened scrutiny. What's your best case for justifying the cross-check, something like 42% here? Your Honor, in terms of that percentage, 40% is a percentage that actually is approved by the federal courts in California. And, actually, I'd like to... Usually those are when the class benefits tremendously here. Really, the class didn't, and it seems like probably the deal here was claimed to be everyone knows the redemption rate is very, very, very low. I know you say there's a chance, but, you know, look, there's a chance for anything. But everyone knows that it's going to be 1%, 2%. So, I mean, it seems like everyone knew that the claims rate would be very low and they're going to pay very little. Well, Your Honor, I would disagree with that. I think that, number one, the benefits here are generous. Everyone knows, again, the claims rate are very, very low. But we tried hard, Your Honor, to boost the claims rate. And the class counsel here actually paid out of pocket for the supplemental notice to make sure that we did get a good claims rate. And we ended up with a 1.8% claims rate, which is within the range of, you know, claims rates that have been approved by district courts in the Ninth Circuit. And in terms of... How low did she get to 1.8%? That seems to make Judge Lee's point. Well, I've never been able to figure out exactly what causes class members to make claims or not make claims, Your Honor. But, you know, I would say that $900,000 of claimed relief is not nothing. And you've justified 42%? Well, Your Honor, we think in this doubtful and disputed case, if you look at the facts that are in the record, if you look at the supplemental excerpts of the record submitted by California Pizza Kitchen here, and they talk about how this was a ransomware case where the primary motivation of this data breach was to procure a ransom from California Pizza Kitchen and not to misuse, you know, the personal data that was accessed, but possibly not even looked at. It's unstructured data. The subset here of Social Security numbers that were affected was de minimis in the scope of the total breach, as testified to by Mr. Karsakis, or he talked about it at the preliminary approval hearing. So that is in the record that we have a very small subset of Social Security numbers compromised here. Some of the information, the personally identifiable information here that's in this data breach, were the recipes, the recipes that were actually used by California Pizza Kitchen. This was not hot stuff, Your Honor. And so to the formula for Coke, right? You know, while it's not the formula for Coke, you know, their chicken salad recipe is just not. And so basically, you know, is this a good value for a case of this type, a doubtful and disputed case that is negotiated right on the heels of the TransUnion decision, TransUnion versus Ramirez, which talks, you know, very much about, you know, people not having claims who don't suffer any injury. This is a good value for the class. I see I'm way over my time, and I apologize. You're over with questions, and we appreciate it. We don't pay overtime. Oh, well, I appreciate that, too, Your Honor. Thank you very much. So we'll hear from Mr. Kardasakis. And since we took your counsel over time, we won't deduct from yours. We'll give you your full five minutes. Thank you, Your Honor. May it please the Court, as you know, John Kardasakis, representing California Pizza Kitchen. The first thing I wanted to address was Judge Lee's question, because absolutely you can affirm the settlement even if you have some questions and ask the Court to take another look at the fees. The parties structured the settlement so that the settlement itself, the benefits to be paid to class members, which, if this is affirmed, they will get benefits paid promptly, would stand regardless of what happens to the fees. The settlement agreement provides, in part, the court-approved class counsel payment will not affect any benefits provided to class members or plaintiffs. So it's quite clear that the answer to your question, yes, you can affirm the settlement as a whole. And if you have any significant questions about fees, you can ask the Court to take another look at the fees and leave the favorable settlement for the class in place. Why do I describe it as a favorable settlement for the class? And it was very much a fair, reasonable, and adequate settlement for class members. The record demonstrates that the claims of the class were exceptionally weak. And this goes back to your Honor's question as well. Appellants don't want to discuss the facts of the data breach. And in these cases, I defend a lot of them. Mr. Meyer brings a lot of them. Mr. Leeds brings a lot of them. Not all data breaches are the same. There are different types. We put into the record here declarations to explain that what this was was a ransomware attack by the well-known ransomware group, Conti. That's in the declaration of Kroll's Cyber Threat Intelligence Program leader, Keith Wojcicki. It's in the supplemental record that we filed at pages 43 and 48. He explained Conti is a well-known ransomware attacker. Their modus operandi is they'll get into the system. They'll encrypt the system. They'll leave a note in the system telling the defendant, this is Conti that did this to you. Pay us money, and you'll get three things. We'll tell you how we got in so you can correct the problem so you don't have that happen again. We will give you a decryption key, and we'll delete any data we've taken so you don't have a risk of harm to the people whose data we have. Now, appellants will say, well, you know, these are criminals. How can you believe these folks? They're right. They are criminals. There's no doubt about that. But the fact of the matter is their whole business model is pay us a ransom, and you get these things. And one of our colleagues who sadly isn't hearing cases anymore, Steve Trott, was famous for making presentations to prosecutors about the risk in relying upon jailhouse informants. And one of the points he made very clearly is that they're criminals, and you can only trust them so far. And I sit and hear this. And let me pose the question that's really gnawed at me the most, which is that suppose your criminal turns out not to be trustworthy. I understand the business model, but they may have people within the organization that go rogue, and the dark web is out there, and maybe the number of Social Security numbers breached were limited. But what happens if five years from now, one of the people whose data has been breached hits the wall because they loot whatever they can from him? What recourse does that person have in the wake of this settlement? Whenever you have a class action like this, you're asking the court to adjudicate the claims of everyone now based on what they can show as damages now. So in your hypothetical, if hypothetically something came up in five years, that could be a problem. That person's unelected, so everybody in the class has to rely upon the criminal. Well, isn't that a problem? In theory it is. Everyone has an opportunity to opt out of the class. We send notice to everyone. Anyone who wants to opt out can opt out. So people who are worried about the risk you lay out, we did, in fact, have four people opt out. Four out of how many? Four out of what was it, 103,000? Which is what almost always happens. And that's why, I mean, I'm not saying that these cases can't be settled. I understand entirely why people like your client want to close the door on this. And yet out there there is still gnawing and concern about what about this schnook who gets caught up in it sometime down the road. I mean, this isn't just this case. It's the data breach cottage industry, the settlement cottage industry that's developed and leads me wondering, gee, what happens to the guy who might get screwed five years from now? I don't have a solution for that, but I'm not sure how these settlements really address that problem. They don't. In part, I would say we don't have a record of that happening. While it's theoretically possible, we don't see that happening. Well, but I've received too many presentations about the dark web to leave me comfortable that it won't. We have in the record the declaration of Keith Wojcicki regarding the search of the dark web, which found nothing. I see my time is up, so. You can continue after that. I have a further question. Oh, right. This is a difficult thing. We want to hear from you. It is, and that's why in these cases, frequently what we do is we challenge whether the plaintiffs even have Article III standing because the theoretical harm that you've outlined, it's not imminent harm, and these people can't show actual damage at this point. The two plaintiffs, the appellants, their complaint, one of the two appellants failed to allege any damage, any actual damage at all. Well, actually both of them did in the original complaint. The court granted our motion to dismiss in the amended complaint. Then Plaintiff Pittman said, well, you know, I had some fraudulent charges on my debit account or somebody tried to have fraudulent charges on my debit account, and I got locked out of my Amazon account, and we put into the record the declaration from CPK's person explaining whatever caused that, we had no information about his debit account. So he may have had somebody try and do something fraudulent with his debit account, but employees don't tell CPK usernames or passwords for their debit account. Yeah, we don't do that. Same thing with his Amazon account. He may have had something bad happen with his Amazon account, but he hadn't given to CPK any information about his Amazon account. So if this case were to proceed, and you talk about what would happen to the class, I agree with Mr. Leeds, this is a very favorable settlement to the class because they were going to have significant problems demonstrating Article III standing, even for the named plaintiffs, much less for all the class members. I know you said you had a question there. I don't know how to address your question. You want to hear what your response is on this procedural issue because we've been mostly talking about the substantive issues. But, you know, another quote I'm looking at is from the Allen case where we said to survive appellate review, the district court must show it has explored comprehensively all factors and must give a reasoned response to all non-frivolous objections. And then we went on to say here the district court did not satisfy this procedural standard. We take no position on the substantive fairness of the agreement because the record before us does not allow us to undertake even our deferential substantive review. Why don't we have the same problem here? Because he laid all the problems on the table and he said on the record, that's a really big problem. And then we get, you know, a rubber stamp that just recites the bottom line and has no reasoning. Why under Allen and other cases doesn't that have to go back then? I think it's fairly clear from the record as a whole here that Judge Carter did take quite seriously these allegations of collusion and examined that. But I don't know why he said he was troubled by it and then the next day he wasn't, and I don't know why. Well, it's the lack of substance to back it up, that the appellants come in and they make these allegations of collusion and then offer something to actually prove it. We had a hearing. I was there. If anybody wanted to swear me in and have me give testimony, okay, I was there. They didn't ask for that. Mr. Leitz was there. The transcript reflects. Mr. Leitz was there. Ms. Bird was there. But he doesn't say on the transcript any explanation as, ah, now I see it and this resolves my concern. All he does on the transcript is says that he has these concerns and then maybe it was the preliminary order. Literally the very next day the order comes out, everything's fine. I believe the transcript from the preliminary hearing actually does go into he found the mediator's testimony to be very helpful and very credible and that satisfied those concerns. That's the preliminary hearing, Your Honor. He's very complimentary of the mediator. After having examined him, again, this is extraordinary. I do a lot of these cases. This is the only time I've had a district court actually ask us to bring in the mediator and put people under oath and testify. And that transcript reflects that after hearing the mediator's testimony, Judge Carter was satisfied. So I believe the record as a whole does meet this court's requirements. Thank you.  All right. Thank you very much, Your Honor. I will hand it over now to Mr. Meyer. Thank you very much. I'd just like to take a minute to look at the record, which everybody seems to agree is quite important. After questioning the mediator, the district court called the settlement reversionary, said $800,000 in fees is too much. And now I'm not sure if it was at that time or before or after, but with respect to the lodestar, the one thing the court did say is that there were too many attorneys billing, and he was making jokes about it. We quoted it in our papers. As Your Honor noted, the district court never explained why all of these issues shouldn't cause us any concern or why he was satisfied that despite these issues, the settlement was fair, reasonable, and adequate. There's just nothing in the record to address those obviously glaring concerns. With respect to the mediations, one thing that does come out of the mediator's testimony here is that by the time they got to mediation, the settling plaintiffs and defendants had already agreed on a claims made structure, and they were just negotiating amounts is the way the mediator put it to fill that in. So they'd already agreed on this preferential structure for defendants by the time they got there. And as we pointed out in our papers, the mediator said he's done over a dozen data breach settlements in all except for one, which was a health data breach settlement that had been settled on a claims made basis, which I find astonishing given the large number of data breach settlements that do settle on a claims made on a common fund basis. And what's the claims rate from the common fund? It varies, Your Honor. I mean, I'm not sure there's really a big substantive difference, is there? The problem with class action generally, and Judge Lee alluded to this, is that the response from most class members is low, and I don't think it changes from a common fund context to a claims made context. I think it's the money out from the defendant. Your Honor, there is a clear correlation between the value of the benefits that are promised to class members and the number of claims you get. The more money, the more valuable, the better. The claims rate is going to depend on how much is in the pot to be claimed. But the claim rate, I haven't seen anything that suggests the claim rate changes unless you induce it by putting more money out there to reach out for it. Your Honor, I'm not sure that the claims rate is going to be higher in a claims made versus a common fund settlement, but we do know that there is. In a common fund settlement, there's the argument I thought I was hearing, that the problem here is that they had a claims made structure from the beginning, and aha, that's a problem. But it turns out if there's not really a difference in the claims rate, that's not a problem. It's not an indicator at all. It's how much is out there to be claimed that makes the difference, and that's a problem in assessing whether the settlement is fair, reasonable, and adequate, because we don't know how much the defendant is paying out when it's a claims made settlement, and you cannot make that determination until all the claims are in and have been scrutinized. I do want to make one more point in regards to what you can do for folks who may suffer harm in five years, and that's get them as much as possible now and get them credit monitoring that's going to last as long in the future as possible. Here, there were two years of credit monitoring offered, but it commences, I guess, immediately as soon as the effective date, or whenever reasonably soon thereafter, when it could be. We've negotiated settlements where the credit monitoring takes effect after expiration of any similar service that the claimant may have, which would provide an advantage. Are you saying anything about what payouts were actually made, how many of the claims made were actually allowed and paid? No, Your Honor, they have not been validated. The one thing the record makes clear is that all the numbers are unvalidated numbers. At some point in the future, presumably, if this settlement were affirmed, the administrator would sit down and look at these claims and decide which were valid and how much they could be honored for. And I think, by the way, looking at these numbers, I see the total value of the settlement to class members coming to $761,000. That's excluding the notice administration costs of $172,000 and attorney's fees of $800,000. So, you know, we're all sitting here looking at it and coming up with different numbers, but the point is that's the district court's job, and it didn't do that here. Okay. All right. Thank you, counsel. Thank you, counsel. Thank you. All seconds on the case just argued will be submitted, and we will stand and recess for today. All rise. Hear, ye, hear, ye. All persons having had business before the Honorable United States Court of Appeals for the Ninth Circuit will now depart for this court where this session stands adjourned.
judges: CLIFTON, COLLINS, LEE